## FULLERTON v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department.   February 10, 1899.)

1. STREET RAILROADS—INJURIES TO PERSONS IN STREET—NEGLIGENCE.
   A street car on a populous street ran over a four year old boy, who started to cross the street when the car was 100 or 125 feet away.   The car was going down a steep grade at about 20 miles an hour.   The usual rate of speed of a car was 8 or 10 miles an hour, and, traveling at such rate, it could be stopped within 20 feet.   As the boy began to cross the street, a person in an adjoining house and passengers in the car screamed; and the motorman looked at the house, then at the passengers, and then began to stop the car, which was 40 feet away from the boy, but its speed was such that he was unable to bring it to a standstill until the boy had been run over.   *Held*, that the question of the motorman's negligence was for the jury.

2. SAME.
   It is the duty of a motorman to keep the car under such control as to be able to bring it to a standstill in time to avoid injury to persons on the street.

   McLaughlin, J., dissenting.

Appeal from trial term, New York county.

Action by John Fullerton, an infant, by his guardian ad litem, against the Metropolitan Street-Railway Company.   From a judgment of dismissal, plaintiff appeals.   Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

C. E. James, for appellant.
Charles F. Brown, for respondent.

RUMSEY, J.   On the 3d of August, 1897, the plaintiff, a little child about four years old, was living with his parents on 116th street, in the city of New York, between Park and Lexington avenues. The defendant's line of electric cars ran through that street.   On the morning of that day, about 10 o'clock, the plaintiff, who was in the apartments where his family lived, under the eye of his mother, escaped from the rooms in some way, and went down upon the street.   In a few minutes after he arrived there, a car of the defendant's came upon the street at Park avenue, going in the direction of Lexington avenue; and, while it was approaching, the plaintiff started to run across the street, but was overtaken by the car while he was upon the track, and seriously injured.   This suit is brought to recover the damages which he then sustained.   Upon the trial, at the close of the plaintiff's case the learned justice directed a verdict for the defendant, upon which judgment was entered.   From that judgment this appeal is taken.

There is no claim made by the respondent that the plaintiff or his mother, who had charge of him at the time he escaped from the apartment, was guilty of contributory negligence as a matter of law; but the ruling of the court is sought to be sustained solely upon the ground that the evidence failed to show any negligence on the part of those in charge of the car by which the plaintiff was run down, and it can only be sustained if there was such an absolute failure of proof.   The

order of the court necessarily involved a holding that upon no aspect of the evidence would the jury have been warranted in finding that the defendant was guilty of negligence; and, in the examination of the correctness of this ruling, the plaintiff is entitled to have the evidence construed most favorably for him, and all doubtful questions resolved in his favor. Rehberg v. City of New York, 91 N. Y. 137, 141. If two inferences can be drawn from the facts, it is for the jury to say which of the two shall be drawn (Weil v. Railroad Co., 119 N. Y. 147, 153, 23 N. E. 487); and it must be presumed, upon a nonsuit, or a verdict ordered against the plaintiff, that the jury would have drawn that inference which is most favorable to him. The question presented here, then, is whether there is any aspect of this case, upon the evidence, in which the jury would have been warranted in finding that the employé of the defendant engaged in running the car was guilty of negligence which brought about the injury to the plaintiff. The car was an electric car, operated by means of an underground trolley. It was going east on 116th street. It had turned into that street at Park avenue, and was proceeding towards Lexington avenue. At Park avenue there commences a sharply-descending grade towards Lexington. The ordinary speed of the car is 8 or 10 miles an hour, and the jury would have been warranted from the evidence in finding that at that speed a car could have been stopped within 20 feet. The electric power, however, can be turned on so as to run the car at a much higher speed, in which case the time required to stop it, and the distance which it would run before being brought to a standstill, are considerably greater. The evidence showed that after the car turned into 116th street, on its way east, its speed became considerably accelerated, so that it was much greater than the usual speed at which the car was run. Some of the witnesses put the speed at 20 miles an hour. While these estimates are not necessarily to be accepted by the jury, yet it is quite clear that the jury might have accepted them, if they had seen fit to do so, because there is nothing in the evidence which shows that there is anything incredible in that rate of speed, and the evidence would clearly require the jury to find that the car was running at a rate of speed very much greater than usual. It was upon a down grade, also, which necessarily made it more difficult to control the motion of the car than if it had been running upon a level track. The boy stood, when he was first seen by the witnesses, on the sidewalk, about 18 feet from the track on which he was hurt. At that time the car was from 100 to 125 feet away, proceeding rapidly in the direction of the boy. The witnesses testified that their attention was attracted to the situation of affairs by the outcry of a woman in the window of a house upon the street, which was immediately followed by screams from some of the women in the car, and that they noticed the boy was running rapidly towards the track, evidently with the intention of crossing it. The attention of the motorman was attracted by these screams, and he looked first at the woman in the window who was screaming; then, hearing the screams in the car, he turned and looked into the car; and then, for the first time, apparently, became aware of the cause of the outcries, and looked forward, and as quickly as possible took steps to stop his car. The jury might have found

from the evidence that when the screams were uttered the car was from 100 to 125 feet away from the little boy, but that there was some short delay before the motorman began to stop the car, caused by his attention being drawn to the persons who were screaming, and that, when he did begin to stop, the car was something over 40 feet away from the boy, who was rapidly approaching the track. It is almost necessarily to be inferred that the motorman attempted to stop the car, either because he saw the boy upon the track, or because he had reason to believe that the boy would attempt to cross the track in front of the car. In either case, the situation as then presented to him was such that he recognized the necessity of using the appliances provided to bring the car to a standstill. The evidence showed that he was unable to check the car while it was passing the space between it and the boy, and that it was not brought to a standstill until the boy had been run over and very seriously injured. The plaintiff insists that the motorman permitted the car to acquire such a rate of speed that he practically lost control of it, and was unable to stop it in time to protect persons who might be upon the street, and for that reason the jury might have found that he was negligent.

There is no statute which prescribes the rate of speed at which one may run a car through the streets of the city of New York, and, therefore, except in extreme cases, it cannot be laid down that to run a car at any given rate of speed in any place constitutes negligence, as matter of law. Crocker v. Ice Co., 92 N. Y. 652; Bittner v. Railway Co.. 153 N. Y. 76, 46 N. E. 1044. It is not intended to say that a rate of speed cannot be so great that, taken in connection with all the circumstances, the court would not be required to hold that it constituted negligence of itself; but circumstances which would warrant such a holding would be extreme. Ordinarily, the question whether the speed constituted negligence is a question of fact, to be determined by the jury in view of the surrounding conditions at the time. All these things are to be taken into consideration. The duty of the driver of the car was to manage it in a reasonably prudent and careful manner, having in view all the conditions which surrounded him at the particular place where he was; and whether in the case at bar he did so manage his car was to be determined by the situation as it was then exposed by the evidence presented in the case. It appeared that 116th street was built up solidly on the south side with apartment houses, and that there were one or more houses on the other side of the street. Just at the time of the accident there appear to have been few pedestrians upon the street. The grade, as has been stated, was steep, running down from Park avenue to Lexington in the direction in which the car was going, and the neighborhood was one which it is fair to infer was populous. While there happened to be no one on the street at that time, yet it was clearly the duty of the motorman to keep his car under reasonable control, so that he could manage it with sufficient promptness to stop it promptly, if occasion arose to do so. While there must be conceded to vehicles of this kind a right to run at a considerable rate of speed, yet that rate of speed must in all cases be such as is reasonable and safe, in view of the correlative rights of other persons upon the streets. Those living upon the

streets have the right to be upon them, not only to go backward and forward, but to cross them, as their necessities, business, and even pleasure, may require; and the cars running along the street must be managed so as to give such persons a reasonable opportunity to exercise their rights in the streets, if they use ordinary care in doing so. To that end, it is clearly the duty of the persons controlling the movements of such a vehicle to keep the car under such control as to be able to check its speed, or bring it to a standstill, in time to avoid injury to those persons who have occasion to be upon the street. To do this involves, not only the duty of regulating the speed of the car so that it may be stopped within a reasonable time, but of giving such a strict attention to the situation as to be able to use the appliances for bringing the car to a stop without unnecessary delay. What conditions must exist, to establish proper care, in view of those duties, in any given case, cannot be laid down as a matter of law. They must be questions of fact, to be determined by the jury. It is safe to say, however, that if the jury should find that a motorman permitted the speed of his car to be so accelerated upon a down grade, where it would be naturally difficult to control it, that he was not able to bring it to a stop in the time usually taken for that purpose, when the car was running at the ordinary rate of speed, he would be guilty of negligence, for which his employer would be responsible. All, however, that it is necessary to say in this case, is that when it is made to appear that a heavy car, operated by machinery, running upon a steep down grade in a populous street of a city, is permitted to acquire such a rate of speed as this car was running at, so that it could not be stopped in a distance of 40 feet, if necessity required, the question of negligence is for the jury, and should not be determined as a legal proposition by the court.

This conclusion requires that we should reverse his judgment, and order a new trial, with costs to the appellant to abide the event of the action. All concur, except McLAUGHLIN, J., dissenting.